## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HOLLY D.,

         *Plaintiff,*

v.

COMMISSIONER OF SOCIAL
SECURITY,

         *Defendant.*

_____/

Case No. 2:24-cv-12649

Robert J. White
United States District Judge

Patricia T. Morris
United States Magistrate Judge

## REPORT AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 16)

### I.    RECOMMENDATION

For the reasons set forth below, it is recommended Plaintiff Holly D.'s motion for summary judgment be **DENIED** (ECF No. 14), Defendant Commissioner of Social Security's motion for summary judgment be **GRANTED** (ECF No. 16), and the final decision of the Administrative Law Judge (ALJ) be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

On September 14, 2021, Plaintiff filed an application for Supplemental Security Income, alleging she became disabled on March 27, 2020. (ECF No. 11-1, PageID.49). The Commissioner initially denied the application on November 19,

1

2021, and on reconsideration on September 14, 2022. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held telephonically on March 30, 2023. (*Id.* at PageID.49, 79–97). The ALJ issued a written decision on July 13, 2023, finding Plaintiff was not disabled. (*Id.* at PageID.46–62). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied her request on August 9, 2024. (*Id.* at PageID.40–42).

Following the denial of review, Plaintiff sought judicial review on October 8, 2024. (ECF No. 1). The parties filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 14, 16).

## B.    Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

### C.   Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ]

3

will find that [the claimant is] not disabled.

(ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.

(iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.

(iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.

(v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide

evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record."   20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled.   *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).   At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors."   *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled.   (ECF No. 11-1, PageID.62).   At Step One, the ALJ found Plaintiff had not engaged in substantial gainful activity since September 14, 2021, the application date.   (*Id.* at PageID.51).   At Step Two, the ALJ found the following impairments severe: degenerative disc disease; bipolar I disorder; and schizophrenia.   (*Id.* at PageID.52).

At Step Three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of

any listing. (*Id.* at PageID.52–54). The ALJ found the severity of Plaintiff's mental impairments, considered singly and together, did not meet or medically equal the criteria of listings 12.03 (schizophrenia spectrum and other psychotic disorders); 12.04 (depressive, bipolar, and other related disorders); 12.06 (anxiety and other obsessive-compulsive disorders); and 12.11 (neurodevelopmental disorders[1]). (*Id.*).

Next, the ALJ found Plaintiff had the RFC

> to perform light work as defined in 20 CFR 416.967(b) except [she could] occasionally climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; and occasionally stoop, kneel, crouch, or crawl. The work [must be] limited to simple, routine, and repetitive tasks performed in a work environment free from fast-paced production requirements involving only simple work-related decisions and routine workplace changes.

(*Id.* at PageID.54).

At Step Four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.60). However, at Step Five, the ALJ found other jobs in the national economy that Plaintiff could perform. (*Id.* at PageID.61). Specifically, the ALJ found Plaintiff could perform the requirements of a housekeeper cleaner (168,000 jobs in the national economy), a fast-food worker (785,000), and a packer

---

[1] To make such a finding, the ALJ would have to consider whether the "paragraph B" criteria are satisfied, *i.e.*, whether Plaintiff's mental impairments resulted in one extreme limitation or two marked limitations in (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E). The ALJ found Plaintiff only had moderate limitations in these four areas of functioning, which meant her functioning in these areas was "fair." (ECF No. 11-1, PageID.52–54).

(34,000).   (*Id.* at PageID.61–62).   The ALJ thus concluded Plaintiff was "not disabled."   (*Id.* at PageID.62).

### E.    Administrative Record

Plaintiff raises two issues on appeal.  First, she argues the ALJ erred by failing to account for any workplace limitations in interacting with others in the RFC despite finding Plaintiff was moderately limited in this area.  Second, she argues the ALJ erred by failing to account for the episodic nature of Plaintiff's schizophrenia and bipolar I disorder and by only assessing her functioning during periods where her symptoms were under control.  While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issues on appeal.

Plaintiff visited her healthcare provider on August 27, 2019,[2] reporting depression, isolation, severe mood swings, mania, hallucinations, and lack of sleep. (ECF No. 11-2, PageID.841).   She was prescribed Abilify and Remeron after reporting she used to take Abilify and "felt it worked much better for her." (*Id.*).   At a follow-up appointment a month later, her prescription for Abilify was increased after she reported "doing 'good'" but was still having mood swings (although the hallucinations were not as bad).  (*Id.* at PageID.840–41).   Her prescription was increased again in November 2019, after reporting the medications were working

---

[2] Plaintiff alleges her disability began March 27, 2020.  (ECF No. 11-1, PageID.49).  The Undersigned includes this relevant medical history for context.

better but that she was still having some mood swings. (*Id.* at PageID.840). No changes were made in December after Plaintiff reported her "medications are 'working real good'" with improved mood swings, anxiety, depression, delusions, and sleep. (*Id.*). Her prescription was increased again on March 9, 2020 (near the alleged time of her disability onset), after reporting she was "doing okay" and her medications continued to work well but her "[m]oods are still up and down at times but a little better." (*Id.*). In May 2020, Plaintiff "ran out of meds about a week ago but [the meds] were working 'good' prior to running out" and her "moods have been 'a lot better.'" (*Id.* at PageID.839).

In July 2020, Plaintiff's Abilify was increased again to better treat her depression and mood swings and a follow-up appointment was scheduled for August. (*Id.*). However, she did not return for a follow-up until mid-September after she had run out of her prescribed medications for a month. (*Id.*). Since then, she had felt "depressed and irritated" and her nightmares had returned. (*Id.*). Prior to running out, Plaintiff "felt that the increase in Abilify was working well and her depression and moods had improved." (*Id.*). The doctor restarted her on a lower dose of Abilify. (*Id.*).

In October 2020, Plaintiff's Abilify prescription was increased as her mood had been "a little bit off" and she felt on edge. (*Id.*). She was due to follow up in December before her medications ran out again, but did not return until April 2021.

(*Id.* at PageID.838–39).   After being off her medications for several months, Plaintiff reported bad mood swings, a lot of depression, audio hallucinations, high anxiety, and poor sleep.  (*Id.* at PageID.838).   She was restarted on her medications at lower doses and had a follow-up scheduled for May.  (*Id.*).   Plaintiff again ran out of medications and did not return until September 2021, with similar reports, including a manic episode in July.  (*Id.* at PageID.716, 837–38).   At this time, she appeared oriented to person, place, and time; with appropriate hygiene, attentiveness, level of cooperation, eye contact, speech, mood, affect, and thought content; with a logical, coherent, and goal directed thought process; and a fair attention span.  (*Id.* at PageID.858–62; *see also id.* at PageID.996–1000 (same for March 2022); PageID.1216 (February 2023); PageID.1446 (same for March 2023 but noting impaired concentration and attention); PageID.1506–07 (June 2023)).   In October, her prescriptions were increased again after she reported doing better but still having symptoms.  (*Id.* at PageID.836–37).

At her next visit in November 2021, Plaintiff's medications were not changed as she reported things had been getting better, with improved mood swings, depression, sleeping, nightmares, anxiety, appetite, and hallucinations.  (*Id.* at PageID.991).   However, at her January 2022 visit, Plaintiff had been off her medication for a week after not picking them up.  (*Id.* at PageID.990).   She again reported her symptoms were worsening "since running out of meds."  (*Id.* at

PageID.990–91).   In February, her medications were increased again, and she reported some symptoms were still ongoing, though not as bad as before.  (*Id.* at PageID.990).  In addition, records from a therapy session that month noted she had trouble focusing and high anxiety.  (*Id.* at PageID.904).

At Plaintiff's next visit in May 2022, she had run out of medications three weeks before.  (*Id.* at PageID.1119).  She reported really bad daily mood swings, anxiety, and depression.  (*Id.*).  She also reported she functions "10/10" when on medication "but without medicine it is probably 3."  (*Id.* at PageID.1116).  In June, Plaintiff stated "since getting back on her meds she is doing okay" and her symptoms were somewhat improved with "more controllable" mood swings.  (*Id.* at PageID.1210).  Her Abilify was increased.  (*Id.*).  In September, Plaintiff again had "been noncompliant with meds" and admitted "she does not take meds daily" but that they "were working 'for the most part, [she] wasn't as moody with them.'"  (*Id.* at PageID.1209).  The doctor also noted Plaintiff "seems like she could be under influence of substance but [she] denies this."[3]  (*Id.*).  In October, she reported taking medications as ordered without side effects.  (*Id.* at PageID.1497).  At her next appointment in February 2023, her Abilify was increased again after she noticed her

---

[3] Her therapy notes from January indicate she had been using methamphetamine and dealing with mental health issues in conjunction with substance use.  (ECF No. 11-2, PageID.904).

symptoms worsening over the prior week or two.[4]  (*Id.*).

On March 8, 2023, Plaintiff reported "taking meds as ordered without side effects." (*Id.* at PageID.1453).  A little over two weeks later, Plaintiff reported she had again stopped taking her medication and had been depressed "for at least two weeks."  (*Id.* at PageID.1446).  Nevertheless, she was noted to be dressed appropriately.  (*Id.*).  She was well groomed, oriented, cooperative, and maintained eye contact.  (*Id.*).  And she spoke clearly and had no hallucinations. (*Id.*).  But she had impaired concentration, attention, insight, and judgment.  (*Id.*).

In June 2023, Dr. Matthew Dickson conducted a psychological exam of Plaintiff.  (*Id.* at PageID.1505).  In relevant part, Plaintiff discussed feeling nervous and anxious in public, which affected her social behavior.  (*Id.* at PageID.1506). However, she denied having any problems getting along with others while employed and Dr. Dickson noted that "[t]oday, while [anxiety was] evident, this concern does not significantly interfere with her interacting with me independently" and her eye contact was appropriate although she spoke rapidly.  (*Id.* at PageID.1506–08).  Dr. Dickson concluded Plaintiff's "abilities related to social interaction such as appropriately reacting to co-workers, supervision, and others in a competitive

---

[4] The Undersigned notes that each time Plaintiff was noncompliant with her Abilify, she would be restarted at 5 or 10mg.  At this time, her prescription was for 15mg.  (ECF No. 11-2, PageID.1497).  In 2020, when her symptoms were stable, she was taking 20 to 25mg Abilify.  (*Id.* at PageID.839–40).

workplace are moderately impaired." (*Id.* at PageID.1508).

## F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

(i)     Length of the treatment relationship.  The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)    Frequency of examinations.  The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii)   Purpose of the treatment relationship.  The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)    Extent of the treatment relationship.  The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v)     Examining relationship.  A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this

determination, the SSA will consider

[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

15

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."  The ALJ will consider "source-level articulation."  Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record.  Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1).  The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).  As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision.  [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).  The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of

17

paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

 (i) Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

 (ii) Statements about whether or not [the claimant has] a severe impairment(s);

 (iii) Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

 (iv) Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

 (v) Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

(vi)    Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

(vii)    Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

(viii)    Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504. Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed,

apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g).  Further,

"[s]igns must be shown by medically acceptable clinical diagnostic techniques.

Psychiatric signs are medically demonstrable phenomena that indicate specific

psychological abnormalities, e.g., abnormalities of behavior, mood, thought,

memory, orientation, development or perception, and must also be shown by

observable facts that can be medically described and evaluated." *Id.*  Laboratory

findings "means one or more anatomical, physiological, or psychological

phenomena that can be shown by the use of medically acceptable laboratory

diagnostic techniques," which "include chemical tests (such as blood tests),

electrophysiological studies (such as electrocardiograms and

electroencephalograms), medical imaging (such as X-rays), and psychological

tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in

which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will]
> consider all [the claimant's] symptoms, including pain, and the extent
> to which [the] symptoms can reasonably be accepted as consistent with
> the objective medical evidence and other evidence.  [The SSA] will
> consider all [the claimant's] statements about [his or her] symptoms,
> such as pain, and any description [the claimant's] medical sources or
> nonmedical sources may provide about how the symptoms affect [the
> claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a).  But the SSA clarified that

statements about [the claimant's] pain or other symptoms will not alone

> establish that [the claimant is] disabled.  There must be objective
> medical evidence from an acceptable medical source that shows [the
> claimant has] a medical impairment(s) which could reasonably be
> expected to produce the pain or other symptoms alleged and that, when
> considered with all of the other evidence (including statements about
> the intensity and persistence of [the claimant's] pain or other symptoms
> which may reasonably be accepted as consistent with the medical signs
> and laboratory findings), would lead to a conclusion that [the claimant
> is] disabled.

*Id.*  Further, "[i]n evaluating the intensity and persistence of [the claimant's]

symptoms, including pain, [the SSA] will consider all of the available evidence,

including [the claimant's] medical history, the medical signs and laboratory findings,

and statements about how [the claimant's] symptoms affect [him or her]." *Id.*  The

SSA will "then determine the extent to which [the claimant's] alleged functional

limitations and restrictions due to pain or other symptoms can reasonably be

accepted as consistent with the medical signs and laboratory findings and other

evidence to decide how [the claimant's] symptoms affect [his or her] ability to

work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater

severity of impairment than can be shown by objective medical evidence alone, [it]

will carefully consider any other information [the claimant] may submit about [his

or her] symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he

information that [the claimant's] medical sources or nonmedical sources provide

about [the claimant's] pain or other symptoms," such as "what may precipitate or

aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)    Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get

benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)   The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)   The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G.   Argument and Analysis

As stated above, Plaintiff raises two issues on appeal. First, she argues the ALJ erred when failing to include any social limitations in interacting with others in

the RFC due to her mental impairments.  Second, she argues the ALJ erred by failing to consider the episodic nature of Plaintiff's mental functioning.  Each issue will be considered in turn below.

### 1.      Social Limitations

Plaintiff first argues the ALJ erred when, after finding she had moderate limitations in interacting with others, the ALJ failed to include any functional limitations in the RFC or the hypothetical question posed to the vocational expert related to this finding.  (ECF No. 14, PageID.1530–31 (citing ECF No. 11-1, PageID.53)).

The ALJ must consider the "limiting effects of all [a claimant's] impairment(s), even those that are not severe, in determining [their] residual functional capacity."  20 C.F.R. § 416.945(e).  Importantly,

> [t]he adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.  The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . .

SSR 96-8P, 1996 WL 374184, at *4 (July 2, 1996).

At issue here is whether the ALJ properly accounted for Plaintiff's moderate mental impairments when crafting the RFC.  The ALJ explained in the Step Two analysis that Plaintiff's mental impairments, singly or in combination, did not result

in an extreme or marked limitation in any functional capacity.  In interacting with others, the ALJ found Plaintiff had only a moderate limitation:

> The claimant alleged functional limitations with getting along with others, although she noted she gets along okay with authority figures. She noted she has been fired in the past for arguing with her boss.  She indicated she does not really go anywhere anymore, and she feels like everyone is staring at her or thinks that they are out to get her.  At the hearing, the claimant testified that she is frequently irritable and she has trouble being around other people as she things [sic] other people are looking at her.   Treatment notes reflect that the claimant regularly reported mood swings, but at time [sic] she noted her mood swings were controllable with medication.  She sometimes was noted to exhibit an anxious mood, but she was typically found to be well-groomed, cooperative, and polite with normal speech and moderate to good eye contact.  The State agency consultant at the reconsideration level found a moderate limitation in this area.   Accordingly, with respect to interacting with others, the undersigned finds no greater than a moderate limitation.

(ECF No. 11-1, PageID.53 (internal citations omitted)).  The ALJ explained these limitations were "not a [RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3."  (*Id.* at PageID.54).

The ALJ noted the RFC assessment "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."  (*Id.*).  In the RFC analysis, the ALJ summarized Plaintiff's hearing testimony, including that she is often irritable, anxious, angry, and moody; has auditory hallucinations; and has trouble being around people as her palms become sweaty.  (*Id.* at PageID.55).  The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning

their intensity, persistence, and limiting effects were not consistent with the medical

evidence. (*Id.*). The ALJ explained:

> Although not every physical and mental status exam was entirely normal, the claimant was . . . treated for her mental impairments on an outpatient basis only and did not show evidence of suicidal ideation, abnormal motor activity, or grossly abnormal thought process. The overall record suggests that while the claimant's impairments limit her to a light exertional level with restrictions, total disability is not supported by the record as a whole for any durational period during the time at issue.
>
> .   .   .
>
> Regarding the claimant's mental impairments, the record reflects a history of bipolar I disorder and schizophrenia. Overall, the record demonstrates that the claimant's conditions were largely managed with medications, but the claimant's condition over time waxed and waned somewhat as her prescriptions regularly lapsed between mental health appointments. When she was without her medications, her symptoms worsened, and once she restarted her medications her symptoms improved until her prescriptions lapsed and she was without medications again. The claimant engaged in mental health services, and when she was seen shortly before the alleged onset date on March 9, 2020, she reported that she was doing okay, and that her medications at that time, which were Abilify, Remeron, and Vistaril, were working well (ECF No. 11-2, PageID.840). She stated that her depression had improved with medications although her moods were still up and down at times, and she indicated she was sleeping well with stable anxiety (*Id.*). She also denied suicidal ideations at that time (*Id.*). She continued to report doing good in May 2020 (*Id.* at PageID.839), but in September 2020, she noted she had ran out of medications a month prior, and since then had been feeling depressed and irritated (*Id.*). She acknowledged that before running out of medications, they were working well, and her depression and moods had improved, and she noted that her nightmares had got better with the addition of Minipress (*Id.*). However, at her annual physical examination with her primary physician in October 2020, she reported no recent depressed mood and no mania (ECF No. 11-1, PageID.736). When the claimant was seen by her mental health provider in April 2021, it was noted that she had not been seen since October 2020 and that she had been without her

medications since December 2020 (ECF No. 11-2, PageID.838). At that time, her mood were noted to be really bad with daily mood swings and lots of depression (*Id.*). She also noted passive thoughts of self-harm, but no plan or intent, and she noted experiencing auditory hallucinations and nightmares most nights as well as daily panic attacks and poor sleep (*Id.*). The claimant was next seen in September 2021, at which time she reported being out of medications since May 2021 (*Id.*). She reported having mood swings every twenty minutes, as well as lack of motivation and feelings of anxiety and being overwhelmed (*Id.*). She also noted seeing shadows and thinking that she hears a kid crying sometimes (*Id.*). At that time, she noted sleeping too much, although she had nightmares twice a week (*Id.*). Mental status examination findings at that time were largely within normal limits, and the claimant was found to exhibit appropriate hygiene, cooperative and attentive attitude, no abnormal movements, good eye contact, normal speech, euthymic mood, appropriate affect, thought process that was logical coherent and goal directed, no suicidal ideation, no hallucinations, normal judgment and insight, unimpaired cognition, intact memory, and fair attention span and concentration (*Id.* at PageID.858–62). In October 2021, the claimant was restarted on Abilify 5mg for mood/depression and auditory and visual hallucinations as well as Minipress for nightmares, and Vistaril for anxiety/depression (*Id.* at PageID.836). At that time, the claimant said she was doing okay, but that she continued to have high anxiety and panic attacks, as well as daily mood swings and excessive sleeping of 14–16 hours and nightmares five times per week (*Id.* at PageID.837). By the time of her next appointment on November 11, 2021, the claimant reported doing good and that things were better (*Id.* at PageID.991). She reported that she had a new puppy and her mood was not as depressed (*Id.*). She also noted improved mood swings and that her nightmares were stablilized [sic] (*Id.*). She said that her anxiety medications were working well, and he noted no hallucinations or suicidal ideations (*Id.*). Mental status findings remained largely within normal limits (*Id.* at PageID.1089–92). In December 2021, the claimant's anxiety and depression were noted to be manageable (*Id.* at PageID.1079). The claimant continued to report doing good in February 2022, and she indicated that her nightmares were stable, but she noted that she was still experiencing mood swings several times per day and well as anxiety (*Id.* at PageID.990). She indicated that she thought she saw her deceased mom once but denied other auditory or

visual hallucinations (*Id.*).  Mental status findings at that time were largely normal, although she was noted to have limited insight and judgment (*Id.* at PageID.996).  When the claimant was next seen by her mental health provider in May 2022, she reported doing good, but noted that she had ran out of medications three weeks ago, and since that time, her mood swings, depression, anxiety and sleeping had worsened (*Id.* at PageID.1119).  By June 1, 2022, she was noted to demonstrate a good mood, with no hallucinations or suicidal ideations, and although she continued to have high anxiety, her depression was manageable (*Id.* at PageID.1336).  When she was examined by her primary provider in August 2022, the claimant was found to be calmer and less anxious, and she reported she felt calmer and more in control (*Id.* at PageID.1353).  Her anxiety at that time was noted to be improved (*Id.* at PageID.1354).  The following month, the claimant acknowledged that her medications were working for the most part, and she was not as moody with them although she still noted that she gets mad easily (*Id.* at PageID.1209).  Later that month, her anxiety continued to be noted as high, but her depression was found to be manageable (*Id.* at PageID.1278).  Mental status findings in March 2023 indicate that the claimant was found to be well groomed, clean, and cooperative, with maintained eye contact, normal speech, no hallucinations, impaired concentration and attention, disoriented to situation, impaired memory, sad mood, anxious and sad affect, impaired insight, self-injury behavior, impaired judgment and no suicidal or homicidal intent, or hallucinations (*Id.* at PageID.1446).  She was assessed with a PHQ-9 score of 16 and assessed severe recurrent major depression with psychotic features (*Id.* at PageID.1446, 1448).

(ECF No. 11-1, PageID.55–58 (internal citations updated)).

The ALJ then summarized medical opinions and prior administrative medical findings in Plaintiff's record.  Dr. Csokasy, a psychologist who reviewed Plaintiff's medical record, found Plaintiff had only a mild limitation in interacting with others.  (*Id.* at PageID.58).  The ALJ disagreed, finding support for moderate limitations based on Plaintiff's irritability, difficulty being around others, regular mood swings,

and anxiety.  (*Id.*).  Because of the ALJ's finding of moderate rather than mild limitations, the ALJ found support for "additional limitations for a work environment free from fast paced production requirements with only simple work-related decisions and routing workplace changes."  (*Id.*).

The other doctors[5] who evaluated Plaintiff agreed she had moderate limitations in interacting with others.  (*Id.* at PageID.58–60).  Thus, the ALJ concluded "[d]ue to the claimant's mental impairments, which can be exacerbated by stress, the work is limited to simple, routine, and repetitive tasks performed in a work environment free from fast-paced production requirements involving only simple work-related decisions and routine workplace changes."  (*Id.* at PageID.60).

Plaintiff argues this limitation only relates to other mental domains of functioning and does not relate to her ability to interact with co-workers, supervisors, or the public.  (ECF No. 14, PageID.1531).  However, "while the regulations require the ALJ to 'consider' the possible effect of a non-severe impairment on the claimant's capacity for work, there is no accompanying requirement that the RFC must include restrictions reflecting a non-severe condition in the RFC."  *Plotkowski v. Comm'r of Soc. Sec.*, No. 20-cv-12011, 2022 WL 413371, at *6 (E.D. Mich. Jan. 18, 2022), *report and recommendation adopted sub nom.*, *Plotkowski v. Saul*,

---

[5] Dr. Kriauciunas reviewed Plaintiff's medical record at the reconsideration level.  Dr. Dickson performed a consultative examination of Plaintiff in June 2023.

2022 WL 407079 (E.D. Mich. Feb. 9, 2022).

Plaintiff cites *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516–17 (6th Cir. 2010), for the proposition that a claimant's work limitations must be fully conveyed to a vocational expert to serve as substantial evidence in support of conclusion the claimant can perform other work.  In *Ealy*, the ALJ relied on a doctor's assessment in the RFC analysis.  The doctor's assessment included a restriction on the claimant working two-hour segments in an eight-hour workday and with no speed restriction, which the ALJ did not present to the vocational expert.  *Id.* at 516.  In contrast, the "moderate" limitations here were addressed by additional work limitations.  (*See* ECF No. 11-1, PageID.60).

In the RFC analysis, the ALJ concluded Plaintiff's claims regarding the intensity, persistence, and limiting effects of her symptoms were inconsistent with the medical evidence.  (*Id.* at PageID.55).  Specifically, the ALJ reasoned that Plaintiff's conditions were largely managed with medications, but that her symptoms worsened whenever she allowed her prescriptions to run out.  (*Id.* at PageID.56).  In contrast to a psychologist who only recommended a mild limitation in interacting with others, the ALJ found Plaintiff had a moderate limitation due to her "irritability and difficulty being around others," her "regular mood swings," and her "anxious moods."  The ALJ thus included additional work limitations "for a work environment free from fast paced production requirements with only simple work-

related decisions and routine workplace changes." (*Id.* at PageID.58).  The ALJ included this limitation in the hypothetical to the vocational expert.  (*Id.* at PageID.93).

Whether including this limitation in the hypothetical was sufficient to fully apprise the vocational expert of the effects Plaintiff's mental impairments had on her ability to perform work is debatable.  *Compare Pastorino v. Comm'r of Soc. Sec.*, No. 15-cv-10918, 2016 WL 11472338, at *9 (E.D. Mich. Jan. 31, 2016) (hypothetical "need not contain a laundry list of all of [claimant's] particularized conditions"), *report and recommendation adopted*, 2016 WL 787132 (E.D. Mich. Feb. 29, 2016), *with Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005) (remanding to determine whether jobs exist consistent with plaintiff's limitations in concentration where hypothetical did not address them).  However, this issue need not be resolved because even if the hypothetical did not properly include Plaintiff's social limitations, the vocational expert still recommended two jobs with thousands of positions in the national economy that require minimal interaction with others: a housekeeper and a packer.  (ECF No. 11-1, PageID.61–62).  *Cf. Doran v. Comm'r of Soc. Sec.*, 467 Fed. App'x 446, 449 (6th Cir. 2012) (declining to consider argument regarding number of available unskilled office jobs when thousands of jobs available for plaintiff's limitations in other positions recommended by vocational expert).

The vocational expert testified Plaintiff could perform the duties of a "cleaner, housekeeping," with approximately 168,000 jobs existing in the national economy. (ECF No. 11-1, PageID.61–62).   The Dictionary of Occupational Titles (DOT) defines the duties for this job as follows:

> Cleans rooms and halls in commercial establishments, such as hotels, restaurants, clubs, beauty parlors, and dormitories, performing any combination of following duties: Sorts, counts, folds, marks, or carries linens. Makes beds. Replenishes supplies, such as drinking glasses and writing supplies.   Checks wraps and renders personal assistance to patrons.   Moves furniture, hangs drapes, and rolls carpets.   [And] [m]aintains premises of commercial, institutional, or industrial establishments, office buildings, hotels and motels, apartment houses, retirement homes, nursing homes, hospitals, schools, or similar establishments in clean and orderly condition, performing the following duties: Cleans rooms, hallways, lobbies, lounges, rest rooms, corridors, elevators, stairways, and locker rooms and other work areas.   Sweeps, scrubs, waxes, and polishes floors, using brooms and mops and powered scrubbing and waxing machines.    Cleans rugs, carpets, upholstered furniture, and draperies, using vacuum cleaner.   Dusts furniture and equipment.   Polishes metalwork, such as fixtures and fittings. Washes walls, ceiling, and woodwork. Washes windows, door panels, and sills.   Empties wastebaskets, and empties and cleans ashtrays.   Transports trash and waste to disposal area.   Replenishes bathroom supplies.  Replaces light bulbs.

*Cleaner, Housekeeping*, DOT 323.687-014; *Id.*, *Cleaner I*.

The vocational expert also testified Plaintiff would be able to work as a light packer.  (ECF No. 11-1, PageID.94).   The expert explained the best match in the DOT to the labor market today is shoe packer, but that the duties are the same "for any number of light items," such as "toys, games, novelties, office supplies etcetera," which included 34,000 jobs nationally.  (*Id.*).  The DOT describes these duties as

"[p]acks [items], according to case number, in cartons for shipment.  May inspect [items] for defects prior to packing."  *Shoe Packer*, DOT 920.687-166.

These two jobs do not require any public facing duties and seem to require little, if any, interaction with coworkers or others.  *See Leverich v. Comm'r of Soc. Sec.*, No. 16-cv-163, 2017 WL 2805166, at *5 (W.D. Mich. June 29, 2017) ("On [its] face, the cleaner/housekeeper . . . occupation[] do[es] not obviously require interaction with the public."); *Pastorino*, 2016 WL 11472338, at *5 (finding the individual could perform the work of a housekeeper and packager even with limitation on interacting with the general public and coworkers); *Dunn v. Saul*, No. 19-cv-13133, 2020 WL 7700614, at *10 (E.D. Mich. Nov. 30, 2020) (finding job of cleaner does not require significant interaction with supervisors), *report and recommendation adopted*, 2020 WL 7695900 (E.D. Mich. Dec. 28, 2020).

Thus, even if fast food worker was excluded from the list of jobs Plaintiff could perform, there would nonetheless be a significant number of jobs in the national economy she could perform.  *See Martin v, Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) (holding ALJ could have reasonably found plaintiff could perform one position even if other two were excluded); *Staymate v. Comm'r of Soc. Sec.*, 681 Fed. App'x 462, 468 (6th Cir. 2017) (same); *Frans v. Comm'r of Soc. Sec.*, No. 18-cv-00004, 2019 WL 3211929, at *11–*12 (W.D. Mich. Feb. 11, 2019) (finding adequate positions in national economy plaintiff could perform even

with credit checker position excluded), *report and recommendation adopted*, 2019 WL 3205838 (W.D. Mich. July 16, 2019).

The Undersigned thus concludes any potential error by the ALJ was harmless. Even if the ALJ should have included more restrictions on Plaintiff's interactions with others in the hypothetical, the vocational expert recommended two positions with a significant number of jobs in the national economy that do not require significant interaction with coworkers or the public. The ALJ's decision should be affirmed.

### 2.    Episodic Nature of Plaintiff's Impairments

Plaintiff next argues the ALJ erred in failing to consider her mental limitations were episodic in nature and by only evaluating her abilities when she was doing well. (ECF No. 14, PageID.1533). She argues her failure to seek treatment was simply another symptom of her disorder. (*Id.* at PageID.1535 (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009)).

With few exceptions, a claimant must follow treatment prescribed by their doctor if the treatment is expected to restore their ability to work. 20 C.F.R. § 404.1530. Noncompliance alone can constitute a basis for a non-disability finding. *Shearman v. Comm'r of Soc. Sec.*, No. 12-cv-00760, 2014 WL 1217966, at *2, *4 (S.D. Ohio Mar. 24, 2014) (citing *Webster v. Sec'y of Health & Hum. Servs.*, No. 84-cv-5857, 770 F.2d 168 (6th Cir. July 8, 1985) (unpublished table decision)).

Indeed, the question is not whether treatment will cure the claimant, but whether it will restore their ability to work. *Webster*, 770 F.2d 168, at \*3. A claimant's refusal to follow treatment will defeat the claim "in the absence of proof that he [or she] is incapable of following a course of prescribed treatment." *Id.*; *see also Gwizdala v. Comm'r of Soc. Sec.*, No. 98-cv-1525, 191 F.3d 452 (6th Cir. 1999) (unpublished table opinion) (same); *Davis v. Astrue*, No. 11-cv-00062, 2012 WL 2324396, at \*6 (M.D. Tenn. June 19, 2012) (failing to continue mental health counseling appropriate consideration for ALJ).

Plaintiff argues an ALJ must consider why a claimant failed to seek medical treatment before drawing an adverse inference from the lack of medical treatment. (ECF No. 14, PageID.1535). But Plaintiff's citations to SSR 16-3p and *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 (6th Cir. 2016), are inapposite. *Dooley* and the related ruling both relate to an ALJ's assessment of a claimant's testimony and credibility "regarding the intensity, persistence, and limiting effects of symptoms in disability claims," not why a claimant has failed to comply with their medications. SSR 16-3p, 2017 WL 5180304, at \*1. Regarding a claimant's credibility, persistent attempts to obtain relief of symptoms may indicate they are intense and persistent. *Id.* at \*9. In contrast, a claimant who does not seek medical treatment comparable with their subjective symptoms may be found to be not credible. *Id.*

Plaintiff also notes that "[f]or some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White*, 572 F.3d at 283. While true, in this case—just like in *White*—"there is no evidence in the record explaining [Plaintiff's] failure to" timely refill her medications. *Id.* at 284. The record generally reflects Plaintiff regularly ran out of her medications, and her doctors did not conclude her doing so was a symptom of her impairment. (*E.g.*, ECF No. 11-2, PageID.839, 854–55, 1119, 1209). Sometimes she followed up with her doctor and got refills within a week or so, sometimes she went months without her medications. (*Id.*). In January 2022, her doctor "educated [Plaintiff] on [medication] compliance [as she had been] missing days of meds here and there." (*Id.* at PageID.990). At that time, Plaintiff "[r]eport[ed] she ran out of meds about 1 week ago due to not picking up her refills." (*Id.*). The record evidence, can—but does not require—a finding that Plaintiff's sporadic noncompliance with medications was a feature of her mental impairments.

But record evidence also supports the conclusion Plaintiff's noncompliance was not a feature of her mental impairments. For example, the ALJ discussed evidence that Plaintiff: had no problems independently performing personal needs, grooming, caring for children and pets, preparing meals, cleaning her home, paying bills and handling savings; sometimes exhibited impaired memory but more often had intact memory and unimpaired cognition; demonstrated a logical and coherent

thought process; and sometimes noted impaired judgment and insight, which was normal at other times. (ECF No. 11-1, PageID.52–54). The ALJ was within their zone of discretion as factfinder when weighing this evidence and the decision should not be disturbed.

Plaintiff cites *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315 (6th Cir. 2015), for the proposition that the ALJ cannot focus exclusively on times when a claimant is doing relatively well, to the exclusion of voluminous record evidence showing the claimant is more severely impaired. In *Winn*, however, the ALJ impermissibly substituted her own judgment with the opinion of the claimant's treating physician and three other psychologists. *Id.* at 324. The ALJ's decision was based on her conclusion that the doctors' opinions were not borne out by treating records, but the ALJ painted a misleading picture of the plaintiff's mental health with "half-sentences and phrases" that improperly disregarded significant portions of the records. *Id.* at 321–22.

Here, the only time the ALJ disagreed with a (non-treating) psychologist was to find Plaintiff suffered from a *more* severe limitation in interacting with others than the psychologist did. (ECF No. 11-1, PageID.58). The ALJ did not present excerpts intended to misrepresent the record evidence. Instead, the ALJ discussed the episodic nature of Plaintiff's mental impairments extensively and found the "conditions were largely managed with medications, but the claimant's condition

Case 2:24-cv-12649-RJW-PTM ECF No. 18, PageID.1598 Filed 11/10/25 Page 38 of 39

over time waxed and waned somewhat as her prescriptions regularly lapsed between mental health appointments." (*Id.* at PageID.56). The ALJ fully considered the episodic nature of Plaintiff's mental impairments. Plaintiff's argument about "cherry picking" must therefore fail: "the same process can be described more neutrally as weighing the evidence." *White*, 572 F.3d at 284; *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (crediting argument of cherry picking requires court to re-weigh record evidence).

### H. Conclusion

The ALJ properly weighed the evidence and supported the findings with substantial evidence. While the evidence could support a different conclusion, it is not the Court's job to re-weigh the evidence in the first instance. Therefore, Plaintiff's motion for summary judgment should be **DENIED** (ECF No. 14) and Defendant's motion for summary judgment should be **GRANTED** (ECF No. 16).

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further

right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: November 10, 2025              S/PATRICIA T. MORRIS
                                     Patricia T. Morris
                                     United States Magistrate Judge